**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No.** _____

RUTH E. MOYA, individually and on behalf
of all others similarly situated,

               Plaintiff,

          v.

JPMORGAN CHASE & CO., CHASE BANK
USA, N.A., CHASE BANKCARD, LLC and
CHASE BANKCARD SERVICES, INC.**,**

               Defendants.
_____/

         **CLASS ACTION COMPLAINT**

         **JURY TRIAL DEMANDED**

## INTRODUCTION

1.     This class action is brought by Plaintiff Ruth Moya ("Plaintiff"), individually and on behalf of all persons who have been sued by, or on behalf of, Defendants JPMorgan Chase & Co. ("JPM"), Chase Bank USA, N.A. ("Chase USA"), Chase Bankcard, LLC ("CBL") and Chase Bankcard Services, Inc. ("Bankcard Services") (together "Chase" or "Defendants") or their subsidiaries or affiliates, in connection with alleged credit card debt on any credit cards issued (or acquired) by Chase and where Chase obtained a default judgment after submitting a robosigned affidavit in support of the motion for default.

2.     For many years, Defendants have committed debt collection abuses against thousands of their credit card customers who have purportedly defaulted on their accounts.  To collect on these accounts, Defendants have flooded state courts, including Florida courts and state courts across the United States, with collection proceedings against their credit card customers seeking to collect on alleged credit cardholder debt.

3.     A primary objective of Chase's collection strategy is to obtain judgments, and more precisely, default judgments, against Chase's credit cardholders.  A judgment both increases the likelihood that Chase can collect money from cardholders, and it permits Chase to avail itself of various post-judgment collection remedies, including wage garnishment, attachment of bank accounts, and asset seizures.  Accounts subject to a judgment are also more valuable to Chase because third-party debt buyers are willing to pay more to obtain assignments of the rights to collect the purported debt owed on the accounts (with the goal of collecting payments from the cardholders on the alleged debt, plus fees and other costs, in excess of the amount the third party paid to acquire the accounts).  Furthermore, the judgments against credit cardholders trigger a new, longer statute of limitation, extending the time period for collection on the alleged debt, and, in some states, permitting interest to accrue on the judgment amount.

4.     The cheapest and fastest way to obtain a judgment is by the defendant-debtor's default – a "default judgment."  To secure a default judgment, Chase relied upon and/or submitted improper, incorrect and fraudulent affidavits attesting to the alleged cardholders' debts.  These affidavits were executed by Chase employees *en masse*, often thousands at a time, one-after-the-other, without the affiant reviewing or verifying the information attested to in the affidavits.  In other words, the affidavits were "robosigned."  The affidavits were then notarized *en masse* by notaries who did not witness the execution of the documents.  Because Chase's ability to maximize its revenue from its debt collection practices depended on executing affidavits concerning alleged cardholder debt as quickly as possible and in great number, Chase's business model and practices did not ensure that the affidavits attesting to the cardholders' debt were accurate, were executed by an individual who had personally examined the records concerning each cardholder's alleged debt, and were properly notarized.

5.      Chase has been successful in obtaining default judgments due to this large-scale pattern and practice of fraud and abuse of the legal process.  Rather than follow basic procedures to ensure fairness to its cardholders and properly meet the burdens prescribed by law, Chase engaged in a scheme to obtain default judgments, writs of execution, and wage-garnishment orders through lawsuits (and other proceedings) designed to render rapid default judgments without scrutiny.  If Chase followed the guidance of the Office of the Comptroller of the Currency ("OCC") or the Consumer Financial Protection Bureau ("CFPB"), Chase would be unsuccessful in these collection efforts and the accounts that Chase markets and sells to third-party debt collectors would be unsalable.  Chase could have easily put policies and procedures into place that complied with its obligations under the law, but instead, in order to maximize its revenues, Chase engaged in systematic fraud and made a mockery of our legal system.

6.      In this class action, Plaintiff seeks: (a) an order permanently enjoining Defendants from engaging in these unlawful, unfair, and fraudulent practices; (b) an order requiring Chase to provide Plaintiff and members of the Class with notice of Chase's misconduct and the borrower's option and procedure to re-open their cases so they may seek to expunge the default judgments; (c) an order requiring Chase to file notice in the state court actions notifying the courts of Chase's use of fraudulent affidavits in support of obtaining the default judgments; (d) reimbursement of all monies unlawfully taken due to the default judgments that Chase obtained by fraud; and (e) other damages including but not limited to punitive damages.

7.      Plaintiff seeks relief under the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count I); conspiracy to violate 18 U.S.C. § 1962(c) (Count II); and common law fraud (Count III).

## JURISDICTION AND VENUE

8.      This Court has federal question jurisdiction over Plaintiff's RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Plaintiff is a citizen of Florida.  Defendants are citizens of different states.  The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members of the Class.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resided in this District at the time Defendants filed lawsuits against her; the state court in which the fraudulent affidavits were filed in support of Defendants' lawsuits against Plaintiff is located here; Defendants' in-house attorneys responsible for filing the lawsuits have an office in this District; Defendants regularly conduct business in this District; and/or a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

11.      At all times relevant to the allegations in this Complaint, Plaintiff Ruth E. Moya lived in Miami, Miami-Dade County, Florida.  In 2009, Defendant Chase USA brought two collection lawsuits against Plaintiff.  *See Chase Bank USA, N.A. v. Moya ("Moya I")*, No. 09-CC-29925 23 (Fla. Miami-Dade County Ct.); *Chase Bank USA, N.A. v. Moya ("Moya II")*, No. 09-CC-39191 23 (Fla. Miami-Dade County Ct.).  On February 26, 2010, Chase USA moved for default judgment in *Moya II* and submitted an affidavit signed by Zandra Sanchez, an employee of Defendant CBL, in support thereof.  On June 1, 2010, Chase USA moved for default judgment in *Moya I* and submitted an affidavit signed by Kevin Fletcher, an employee of Defendant

Bankcard Services, in support thereof.  Both motions resulted in an order of default being entered against Plaintiff.

12.    Defendant JPM is a financial holding company that maintains its corporate headquarters in New York, NY.  JPM and its subsidiaries provide various banking and financial services including, without limitation, the issuance of credit cards.  JPM's legal department provides in-house counsel to several subsidiaries including, without limitation, Defendant Chase USA.  JPM, at all relevant times, has transacted and continues to transact business in Florida and throughout the United States.

13.    Defendant Chase USA is a national banking association and is one of JPM's principal bank subsidiaries and its issuer of consumer credit cards.  Chase USA is chartered in Delaware and maintains its principal headquarters in Newark, Delaware.  Chase USA was formerly known as Chase Manhattan Bank USA, National Association.  Chase USA, at all relevant times, has transacted and continues to transact business in Florida and throughout the United States.

14.    Defendant Bankcard Services is a subsidiary of Chase USA.  Bankcard Services is a Delaware corporation with its principal place of business in Newark, Delaware.  Bankcard Services provides certain credit card services to Chase USA and JPM including, without limitation, debt collection services and support.  Bankcard Services, at all relevant times, has transacted and continues to transact business in Florida and throughout the United States.

15.    Defendant CBL is subsidiary of Bankcard Services and indirect subsidiary of Chase USA.  CBL is a limited liability company formed under the laws of Delaware.  CBL provides certain credit card services to Chase USA, JPM and Bankcard Services, including,

without limitation, debt collection services and support. CBL, at all relevant times, has transacted and continues to transact business in Florida and throughout the United States.

## FACTUAL ALLEGATIONS

### A.    The Credit Card Debt Collection Industry

16.    The credit card industry is massive, with aggregate transactions totaling trillions of dollars. As is the case in all forms of lending, borrower defaults are an inherent aspect of the credit card business. Thus, credit card issuers must have mechanisms or procedures for recovering debt from borrowers who default.

17.    In its Examination Procedures for the debt collection industry, the CFPB observed:

> A variety of entities, including originating creditors, third-party collectors, debt buyers, and collection attorneys, engage in debt collection. Originating creditors may attempt to obtain payment from the consumer, typically by sending letters and making telephone calls to convince the consumer to pay. Originating creditors also may outsource the collection of debt to third-party collection agencies or attorneys, or sell the debt to debt buyers after an account has been delinquent for a period of time. Third-party collection agencies collect debt on behalf of originating creditors or other debt owners, often on a contingency fee basis. Debt buyers purchase debt, either from the originating creditor or from another debt buyer, usually for a fraction of the balance owed. Debt buyers sometimes use third-party collection agencies or collection attorneys to collect their debt, but may also undertake their own collection efforts. Debt buyers also may decide to sell purchased debt to another debt buyer.

CFPB Examination Procedures; Debt Collection (*Examination Procedures*), attached as Exhibit 1.

18.    Debt collectors, regardless of whether they are internal divisions of originating financial institutions, bank-owned entities, or third-parties, utilize a variety of mechanisms to collect on defaulted accounts. These collection practices include calling or sending mail solicitations to borrowers in an effort to persuade them to make payments.

19.     Historically, credit card lenders and their debt collectors typically only filed collection lawsuits on high-balance deficiencies (*e.g.*, in excess of $20,000) because the lenders feared reputational risks associated with litigating a high volume of small value claims. Increasingly, however, card issuers and other debt collectors, either acting on behalf of issuers or as third party debt buyers, have resorted to filing collection actions in state courts regardless of the balance and in extraordinarily high volume.

20.     In 2006 and 2007, as the housing crisis began to unfold, credit card issuing banks began to realize an increase in the rate of default on credit card accounts.   Furthermore, traditional debt collection methods on these default accounts became less effective.   Together, these extrinsic factors caused the issuing banks and debt collectors to reexamine their collection strategies.   As a result, a decision was made to increase the use of litigation to collect on defaulted accounts.

21.     When consumer credit card accounts go past due, they become "collection accounts."   By obtaining a default judgment (or other judgment), the consumer collection account is converted to an enforceable "judgment account," which allows the debt holder to utilize various post-judgment collection remedies, including wage garnishment, attachment of bank accounts, and asset seizures.

22.     Additionally, obtaining a judgment of any kind, including default judgments, extends the statute of limitations for collecting the alleged debt.   The statutes of limitation for debt collection on default accounts range between two years (South Dakota) to ten years (Rhode Island).   In Florida, the statute of limitations for debt collection on default accounts is 4 years.

23.     After the collection account is converted to a judgment account, however, the statute of limitation applicable to judgments is triggered and extends the collectability of the

account.  For example, although South Dakota's statute of limitations for collections on open default accounts is only two years, once a judgment is obtained, the statute of limitations extends an additional twenty years – a period ten times as long as the initial limitation for pursuing a purported debt.  In Florida, the statute of limitations extends from four years on collection accounts to twenty years on judgments – five times as long as the initial limitation on pursuing the purported debt.

24.     In some states, including Florida, interest also accrues on the amount awarded by the judgment.  For example, in Massachusetts, a judgment extends the statute of limitations to twenty years and the judgment debt accrues interest at 12% per annum – which effectively doubles the judgment debt in just six years if not paid down.  *See The Debt Machine:  How the Collection Industry Hounds Consumers and Overwhelms Courts* ("The Debt Machine") (July 2010), attached as Exhibit 2 at 13).  In Florida, judgment debt accrues at 4.75% per annum.

25.     To realize the benefits of obtaining judgments against cardholders who have allegedly defaulted on their credit card accounts, the issuing bank or its third-party collectors seek to obtain as many judgments as possible in the shortest time frame.  Thus, the banks and debt collectors are pursuing tens of thousands of such actions, straining (if not exceeding) the limits of the judicial system initially created to manage debt collection proceedings.  Because the collectors' goal is to maximize revenue from these accounts (*i.e.*, receive payments from cardholders), some collectors eschew proper due diligence on the accounts and the amounts allegedly owed, in favor of rapidly executing numerous affidavits used to obtain the judgments they desire.

26.     The submission of improper, incorrect or fraudulent affidavits in support of motions for default judgments is exacerbated by the fact, well known to Defendants and other

debt collectors or buyers, that cardholders are frequently unable or unwilling to oppose a debt collection action.  In many instances, cardholders are unaware that they are the target of the collection action because they do not recognize the party initiating the action (such as when a debt collector or buyer commences an action, rather than the issuer of the card).

27.     The combination of the increased value of accounts with enforceable judgments and the ease with which debt holders are able to obtain default judgments has led to the large increase in collection actions and, unfortunately, corresponding abuses of legal processes such as those set forth herein.  The sad truth of the matter is that debt collectors rarely make even a passing attempt at substantiating their claims.

28.     For example, in December 2009, the Municipal Employees Legal Services ("MELS") for District Council 37 in New York released the results of a study they conducted pertaining to debt buyer lawsuits.  *See Where's the Proof? When Debt Buyers are Asked to Substantiate Their Claims in Collection Lawsuits Against NYC Employees and Retirees, They Don't*, ("MELS Study") (December 2009), attached as Exhibit 3.  After surveying 238 cases in which MELS was involved during the period from January 1, 2008 to June 30, 2009, MELS made the following findings:

    a.    After MELS requested substantiation of the debt, the debt buyer responded only 5.5% of the time;

    b.    Even when the debt buyer did respond, rather than showing that the debt was owed, its own documentation often proved the opposite;

    c.    In 27% of cases, MELS's clients had only learned of the lawsuit after their salary was garnished or bank account restrained – implying that the client had not been properly served; and many other clients were not properly served in accordance with the law but became aware of the lawsuit prior to a default judgment or post-judgment enforcement actions by the plaintiff.

MELS Study, Exhibit 3 at 3 & 6.

29.     MELS determined that after a debtor defendant requested substantiation of the debt, in 86.3% of cases, the plaintiff debt collector took no further action to collect the debt, including discontinuing the action in 13.7% of cases.  *See* MELS Study, Exhibit 3, at 5.

30.     The MELS Study concluded that "[t]he debt buyer business model is geared solely toward default judgments.  Plaintiff creditors and debt collectors stop pursuing a lawsuit once a defendant retains a lawyer; and instead devote their resources to obtaining default judgments which do not go before a judge and require minimal if any proof."  MELS Study, Exhibit 3, at 10.

31.     Even when debtors do attempt to defend against these collection suits, they are frequently without means to retain a lawyer and effectively challenge the suit.  For example, a whitepaper written by The Legal Aid Society, MFY Legal Services, Inc., Neighborhood Economic Development Advocacy Project and the Urban Justice Center examined debt collection suits in New York City Civil Court between January 2006 and July 2008.  *See generally Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, ("Debt Deception") (May 2010), attached as Exhibit 4 (examining two samples of cases from 26 debt buyers that filed ***457,322*** lawsuits in New York City Civil Court between January 2006 and July 2008 and were awarded an estimated $1.1 billion in judgments and settlements).  Among the key findings were:

    a.    95% of people with default judgments entered against them by the debt buyers resided in low- or moderate-income neighborhoods, and 56% lived in predominantly black or Latino neighborhoods;

    b.    Not a single person in the sample was represented by an attorney and only 1% of people sued by debt buyers are represented by counsel;

    c.    Only 10% of people sued answered the summons and complaint; and

    d.    At least 71% of people sued were either not served or served improperly.

Debt Deception, Exhibit 4, at 1-2.

32.     These abuses are by no means limited to third-party debt buyers, and are not limited to the New York samples reviewed in those large studies.  To the contrary, the abuses occur nationwide and are engaged in by originating creditors, debt collection agencies on the creditors' behalf, and third party debt buyers.

33.     In a July 2010 whitepaper authored by the National Consumer Law Center ("NCLC"), for example, the NCLC identified abuses in Montana, Illinois, New York, Maryland, Massachusetts, Virginia, Iowa, Michigan, Minnesota and New Jersey, among others as states in which such abuses are rampant.  *See generally The Debt Machine*, Exhibit 2.

**B.     Chase's Credit Card Collections Practices**

34.     Chase operates one of the largest credit card issuing operations in the United States.  According to JPM's August 2, 2010 letter to the Securities and Exchange Commission (attached as Exhibit 5), JPM was the second largest originator of credit card receivables.  In 2012, Chase issued approximately $128 billion worth of credit to consumers through more than 64 million credit cards.

35.     Chase's credit card business includes Chase-originated accounts (*e.g.*, Chase Sapphire and Chase Ink); accounts acquired from other banks that are now in run-off (*e.g.*, Providian and Washington Mutual); and a miscellaneous set of accounts including, without limitation, other points-earning credit cards.

36.     Prior to the shutdown of its internal credit card litigation collections division in 2013, Chase performed much of its credit card litigation in house.

37.     Defendant JPM had in-house collections attorneys in five office sites located in New York, New Jersey, Florida, Illinois and California.  Prior to its merger with Bank One

Corporation, Chase only litigated collection accounts in those five states using in-house attorneys. Those states accounted for approximately 75% of all Chase default accounts. After the Bank One merger, however, Chase expanded its collections litigation operations to 23 states. At some later point, Chase discontinued litigating default accounts in 5 of those 23 states due to low returns, bringing the total to 18 states.

38.     In addition, JPM's private equity subsidiary, One Equity Partners ("OEP"), owns approximately 80% of the Class A common stock in NCO Group, Inc. ("NCO"),[1] a holding company that operates the largest debt collection operation in the United States.

39.     NCO collects debts for numerous financial institutions, including Chase, American Express, Bank of America, Capital One, Resurgent Capital, Discovery and Citigroup.

40.     NCO also collects debt in its own name where NCO acts as a third-party debt buyer.

41.     As part of the services NCO provides for financial institutions and on its own, NCO provides various litigation services and acts as a liaison between financial institutions and debt collectors and debt collection law firms.

42.     Additionally, Chase sells the rights to cardholder debts – both collection accounts and judgment accounts – to third-party debt buyers. As part of its sales of collections accounts, Chase agrees to provide certain information to the debt buyers. That information is usually minimal and the agreements of sale explicitly reference the inability of Chase to verify all such debt. Chase does, however, offer to provide affidavits in support of the collection account debts sold in the transactions.

---

[1] Of the remaining 20%, 6% is held by Citigroup Private Equity and the remainder is held by several individuals. Citigroup Private Equity also holds nearly 40% of the NCO Group, Inc. Class L common stock that is entitled to a yield at an annual rate of 14%.

C.   **Chase's Systems Contained Systematic Errors and Inaccuracies**

43.   Chase uses a worldwide system of record called "TSYS" which was later referred to as "C3."  The TSYS system contains current account information including current balance, current amount due, and history of payments.

44.   Once an account is in "charge-off" status,[2] Chase also stores the account information on a system called "RMS."

45.   RMS is supposed to automatically populate its fields with the records from TSYS when the account is charged off.  To reconcile the systems and ensure that the data is accurately moved from TSYS to RMS, Chase was required to engage in a manual process.  In actuality, Chase rarely, if ever, engaged in that manual process, leaving the RMS system rife with erroneous borrower information.

46.   A third system called "CU" or "Columbia Ultimate" was used to track accounts in litigation.  Like the other systems, CU did not properly communicate with RMS and TSYS such that the systems were each rife with erroneous and/or incomplete information.

47.   Compounding these problems, Chase did not properly update its records when borrowers made payments on accounts.  Thus, while collection activities were ongoing, including but not limited to litigation, if a borrower made a payment on the account, the systems did not update for that payment resulting in the borrower not being properly credited for the payments.  This systematic failure resulted in numerous borrowers' accounts not containing accurate information.

---

[2] "Charge-off" status occurs after Chase declares that the amount of debt is unlikely to be collected.  Typically this occurs after the account is delinquent by 180 days (or 60 days after Chase receives notifications of a specified event, *e.g.*, borrower bankruptcy).

48.     Chase's recordkeeping problems were even greater for accounts acquired from other banks.  For example, in 2002, Chase acquired an $8.2 billion credit card portfolio from Providian, and in 2008, Chase acquired Washington Mutual along with approximately $10.6 billion in receivable credit card debt.  Because Washington Mutual had acquired Providian in 2005, the Washington Mutual credit card debt also included additional Providian accounts.

49.     These acquired accounts had significant problems.  For example, Chase lacked documentation for at least half of its legacy Providian accounts.  Included in the missing and/or inaccurate information were default dates,[3] account balances and payments.  Thus, when Chase's litigation department, debt collectors, or third-party debt buyers requested such information and/or documentary support for such accounts, Chase's systems could not provide that information.[4]

50.     The systematic failures were not limited to payments not being properly reflected in account records.  Indeed, Chase failed to enter into its systems bankruptcy notices, settlement offers, consumer disputes, powers of attorney and communications from settlement companies into customers' account records, resulting in numerous errors and misrepresentations in collections litigation.

**D.      Chase's Collection Practices**

51.     At least since January 1, 2007, Chase has failed to exercise appropriate care and diligence to ensure the accuracy and integrity of customer information regardless of whether

---

[3] Without accurate information on the date of default, it is likely that Chase litigated accounts outside the statute of limitations.  Chase lacked sufficient systematic protections to prevent such improper suits from being filed.  However, because consumers are generally not as sophisticated, and because Chase knew that very few consumers contest their suits, this lack of documentation was rarely if ever brought to light.

[4] As discussed in more detail below, Chase continued to litigate, attempt to collect on, and/or sell to debt buyers these accounts.

such information was even in its possession.  In fact, Chase operated its collections operations with indifference and reckless abandon as to the accuracy of customer information.  Together and through their subsidiaries and affiliate law firms, Chase has engaged in a pattern or practice of abuses and fraud in an effort to: (a) collect on credit card accounts Chase deems are in default; (b) increase the value of targeted credit card accounts by obtaining default judgments; and/or (c) increase the value of the targeted credit card accounts in "forward flow agreements."[5]

52.    The principal mechanisms employed by Chase to achieve these goals was the provision of affidavits signed by Chase employees *en masse* without their having verified that the information attested to was correct.  The use of these fraudulent affidavits was necessary to cover up significant problems related to records associated with accounts acquired from other creditors and due to the massive increase in the number of defaulted accounts that Chase held.

53.    Chase managed offices that were charged with the task of processing these fraudulent affidavits.

54.    Specifically, in October 2000, Chase moved its collections division's offices to San Antonio, Texas.  This division included two units, Process Execution and Attorney Management, that were charged with affidavit processing.

55.    Within the Process Execution unit, one team of 9-10 employees in what was known as the Reconciliation group handled various aspects of affidavit processing.  Specifically, pre-typed affidavits were received via Federal Express each day from the in-house attorney offices.  Approximately 50-100 affidavits were received per day per state.

---

[5] A "forward flow agreement" is a contract between the originating card issuer and a debt buyer to make future sales of credit card accounts (generally referred to as portfolios) that exhibit certain attributes the selling card issuer and/or buyer deem are conducive for debt collection proceedings.  The value of the portfolios in forward flow agreements rises if the portfolios contain judgment accounts as opposed to collection accounts.  Typically, these accounts are sold for pennies on the dollar.

56.     Following receipt of the affidavits, Chase's internal processes and procedures required the Reconciliation employee from Process Execution to log the batch number, first and last borrower name, and the number of affidavits into a "batch sheet."  Doing so only required Process Execution employees to count the number of affidavits in the batch and record the borrowers' names from the first and last affidavit in the batch along with the batch numeric identifier.  The employee did not have to record – and did not record – any information about the affidavits other than the identity of the first and last affidavit.  The employee then put the batch into a drawer.

57.     Either that same Reconciliation employee or a different one (depending on work load and availability) then retrieved the batch from the drawer and took the stack of affidavits to their desk for "validation."  At their desk, the Reconciliation employee checked the pleading caption, the balance on the account, the last payment and the date of last payment using the System of Record (*e.g.*, TSYS) and the litigation system (*e.g.*, CU).  However, as discussed herein, these systems were inadequate to properly verify the information required.

58.     Once the Reconciliation employee checked the systems, the employee returned the batch to the drawer and signed the log sheet noting that the batch was validated.

59.     Once "validated," an employee from the Attorney Management unit retrieved the batch from the drawer.  The Attorney Management employees were responsible for executing the affidavits.  However, on information and belief, these employees never personally validated or verified any information on any affidavit they signed nor did they speak with the validators to ascertain whether the information was verified and/or whether any problems were discovered.  Attorney Management's role in Chase's process was to mechanically sign each affidavit in the batch and then log the batch back in to the drawer.

60.     The Attorney Management employees who systematically robosigned affidavits during the relevant time period included, without limitation, Debra Hicks, Johnny Montemayor, Kevin Fletcher, Zandra Sanchez, Ruben Alcarez, and Alan Soles.  Each of these employees was responsible for signing **thousands** of affidavits in connection with collections litigation without verifying the content of the affidavit prior to signing.  These employees signed the affidavits without personally verifying any information contained therein.

61.     These employees were exempt salaried employees whose bonuses were based on "performance."  In addition to robosigning affidavits, their job duties were ostensibly to monitor the work of attorneys and resolve issues identified by the validators in reconciliation.  However, as a practical matter, because there were typically only 5 employees who had to sign 50-100 affidavits per day per state – **totaling between 250 and 2,300 affidavits per day** – the time devoted to such other tasks was minimal at best.  Thus, on information and belief, these employees' bonuses were tied to their robosigning of affidavits.

62.     Once the robosigned affidavit batches were checked back into the drawer, a notary from the Reconciliation group in Process Execution retrieved the batch from the drawer and affixed a notary seal to each affidavit.  However, despite attesting to the contrary by notarizing the documents, the notary did **not** witness the execution of the affidavit.  The notary simply verified that the first and last affidavit in the batch matched the log and would count the number of affidavits to verify that the count matched as well.  In the notaries' books, only the first and last account name and total number of accounts would be recorded.  The notary then notarized each affidavit and shipped the batch to the law firm or JPM's in-house counsel to obtain judgment against the borrower.  The notaries who improperly notarized documents

included, without limitation, Christina Pas, Lynn Rodden, Dorothia Dembo, Kathy Lynn, Annette Flores, and D. Serrato.

63.     The batch of affidavits was then shipped back to the attorneys handling the litigation and filed in support of motions for default judgment.

64.     Once Chase obtained a default judgment in these actions using these improper, unfair and illegal methods, Chase either directed its affiliates to enforce the judgment using post-judgment remedies including, without limitation, wage garnishment, attachment of bank accounts, and asset seizures, or Chase sold portfolios of such judgment accounts to third-party debt buyers who engage in similar enforcement efforts.

65.     In a complaint filed against Chase by the Mississippi Attorney General for similar abuses, the attorney general alleges that "[i]n 2009, Chase conducted a $600 million deal, which had such significant degradation issues that Chase temporarily halted its debt sales."  *See* Complaint, *State of Mississippi v. JPMorgan Chase & Co.*, No. C-2013-1939, ¶ 74 (Chancery Ct. 1st Dist. Hinds Cty. Miss.).  This problem was by no means isolated in Chase's debt sales. Indeed, the Mississippi Attorney General also alleged that "[i]n at least one instance, Chase sold a portfolio of accounts where 90% of the accounts had been discharged in bankruptcy."

66.     One publicly available forward flow agreement in December 2009 is illustrative of Chase's practices.  In a "Judgments Purchase Agreement" dated December 10, 2009 between Defendant Chase USA and non-party DebtOne, L.L.C. ("DebtOne"), Chase USA sold a portfolio of judgments to DebtOne for just 1.02% of the judgment face values.  A true and correct copy of the sale agreement is attached as Exhibit 6.

67.     The DebtOne judgment sale recognized the fact that Chase did not possess adequate documentation of the debts.  First, the agreement put limits on DebtOne's access to

certain account records.  Specifically, the agreement limited access to documentation to a period of three years from the closing of the agreement.  Moreover, Chase's obligation to provide DebtOne with the documents was limited "to the extent such documents are reasonably available."  Even where the documents were available, Chase limited the provision of "copies of signed Account applications, applicable terms and conditions, and other media relating to the Judgments … to a maximum monthly number of documents of 2.5% of the number of Judgments sold…."  *See* DebtOne Judgment Agreement, Exhibit 6, ¶ 4(b).  Chase further limited the availability of documentation by charging $10 for each document "[i]f the total number of documents provided is greater than ten percent (10%) but less than twenty-five percent (25%) of the Judgments purchased under this Agreement…."  Even with the $10 charge, Chase was only obligated to provide documents if Chase chose to do so in its "sole discretion."  If DebtOne requested documents for more than 25% of the Judgments, Chase had "sole discretion" to provide such documents at a charge of $50 for each document provided.  *Id.*

68.    Chase's "discretion" to provide documents was an artful way of articulating the fact that Chase was unlikely to have documentation for a large number of accounts in the portfolio.  In fact, Chase included the following disclaimer after then-Chase employee Linda Almonte informed Chase that documentation was severely lacking for a large proportion of accounts in the portfolio:

> **EXCEPT AS PROVIDED IN THIS SECTION, THE JUDGMENTS ARE BEING SOLD "AS IS" AND "WITH ALL FAULTS", WITHOUT ANY REPRESENTATION OR WARRANTY WHATSOEVER AS TO EITHER CONDITION, FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, AND SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY, REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, EXPRESS OR IMPLIED, CONCERNING THE JUDGMENTS, OR THE STRATIFICATION OR PACKAGING OF THE JUDGMENTS.**

DebtOne Judgment Agreement, Exhibit 6, ¶ 5(j).

69.     Chase provided the account information for the judgment debtors to DebtOne (and other debt buyers) through Microsoft Excel spreadsheets.  These spreadsheets were prone to additional errors due to programmatic limitations and the fact that transferring the data from Chase's systems to Excel-format caused information to be dropped, transferred incorrectly, or become truncated.  For example, the spreadsheets frequently missed all or part of account numbers, social security numbers and listings of co-obligors on accounts.

70.     Chase did not verify the accuracy of information or the availability of documentation supporting accounts – regardless of whether the sale was a judgment account sale as in the DebtOne transaction or a collections account sale – prior to entering into the transactions.

71.     Nevertheless, Chase agreed to provide third party debt buyers, like DebtOne, with affidavits attesting to the debts.  Of course, because Chase's practices as described herein did not involve any actual review of original records and minimal, if any, review of any account data, the existence of documentation was irrelevant to Chase.

**F.     Chase's Collections Activities Drew Scrutiny from Regulators and Media**

72.     When these abusive practices began to draw more scrutiny, Chase began to abandon debt collections as a revenue generating strategy.  Beginning in approximately 2011, Chase's collection rates began a steep decline, particularly as compared to its principal competitors.  This decline roughly coincides with Chase's decision to cease collection efforts in numerous states as its practices came under increased scrutiny by state courts, attorneys general and others.  *See infra*.



Maria Aspan and Jeff Horwitz, *OCC's Collections Scrutiny Squeezes JPMorgan*, American Banker (July 8, 2013) http://www.americanbanker.com/issues/178_130/occs-collections-scrutiny-squeezes-jpmorgan-1060445-1.html.

73.   In 2010, one of Defendants' former vice presidents, Linda Almonte, filed a whistleblower complaint with the Securities and Exchange Commission ("SEC").  Ms. Almonte also filed a lawsuit against Chase alleging wrongful termination after she informed her supervisors that nearly half of 23,000 accounts contained in a $200 million credit card portfolio sale were missing proof of court judgments that Chase claimed it had obtained.

74.   On June 24, 2011, the Wall Street Journal reported that Defendant JPM had abandoned more than 1,000 debt-collection lawsuits that sought to recover defaulted credit-card accounts in California, Florida, Illinois, New Jersey, and New York between April and June 2011.  *See* Lender Drops Pursuit of Debt, The Wall Street Journal, June 24, 2011, attached as

Exhibit 7.  The article quoted Mitch Granat, an attorney who handled some of JPM's debt-collection cases on a contract basis, as saying that the bank's attorneys dropped these lawsuits because of "irregularities" in paperwork used to verify the validity of the credit card amounts being pursued.  *Id.*

75.     In January 2012, CBS News and American Banker Magazine reported that Defendants had also begun to withdraw debt collection actions in Maryland and Washington.  *See* Chase Stops Suits Against Credit Card Holders, CBS Moneywatch, January 11, 2012, *available at* http://www.cbsnews.com/8301-505123_162-57357011/chase-stops-suits-against-credit-card-holders/; JPM Chase Quietly Halts Suits Over Consumer Debts, American Banker, January 10, 2012, *available at* http://www.americanbanker.com/issues/177_7/jpmorgan-chase-consumer-debt-collection-1045606-1.html.   American Banker reported that between January 2011 and April 2011, Defendants were on pace to file $50 million in collection suits in Miami-Dade County, Florida alone.  In April 2011, however, Defendants ceased filing claims in Miami-Dade County all together.

76.     By March 2012, American Banker and Time Magazine were reporting that the Office of the Comptroller of the Currency ("OCC") was probing Defendants' credit card collection practices.   *See* Robosigning Redux? Regulator Probes Chase Over Credit Card Collections, Time, Business & Money, March 15, 2012, available at http://business.time.com/2012/03/15/regulator-probes-chase-over-allegations-of-robosigning-in-credit-card-collections/; OCC Probing JPMorgan Chase Credit Card Collections, American Banker, March 12, 2012, available at http://www.americanbanker.com/issues/177_49/chase-credit-cards-collections-occ-probe-linda-almonte-1047437-1.html.

77.     At that time, Linda Almonte was no longer the only former Chase employee describing the "robosigning" practices (*i.e.*, executing thousands of affidavits in a short time) rampant in Defendants' offices.   Howard Hardin, who oversaw a team handling tens of thousands of Chase debt files in San Antonio, stated, "We did not verify a single one [of the affidavits attesting to the amounts Chase was seeking to collect] … We were told [by superiors] 'We're in a hurry.  Go ahead and sign them.'"

78.     By September 2012, American Banker reported that a group of state attorneys general was investigating how major banks, including Chase, process and sell credit card accounts.   *See* State AGs Probing Sales of Credit Card Debt, American Banker, *available at* http://www.americanbanker.com/issues/177_180/state-attorneys-general-probing-sales-of-credit-card-debt-1052724-1.html (Sept. 17, 2013).  Attorneys with the Attorney General's office for the State of Mississippi had contacted Defendants' employees concerning alleged procedural shortfalls and outright errors in defaulted credit card account records that Defendants sold to third-party debt buyers.  *Id.*

79.     On May 9, 2013, the Attorney General for the State of California (the "California AG") filed a lawsuit against Defendants in connection with their debt collection practices.

80.     The California AG's suit alleged that the defendants, which include Defendants here, engaged in numerous debt collection abuses as part of more than 100,000 lawsuits filed between January 2008 and April 2011 (averaging over 100 lawsuits each day the courts were open).  The California AG alleged that in order to maintain the excessive volume of collection lawsuits, Defendants routinely committed the following "unlawful, unfair, and/or fraudulent acts or practices," among others:

     a.     Claiming inaccurate amounts purportedly owed in correspondence with consumers;

b. Filing verifications of the complaint in which the declarant states, under penalty of perjury, that the declarant is an assistant treasurer and officer of Defendant Chase USA even though the declarant is neither an "assistant treasurer" nor an "officer" of Chase USA, but rather a low-level employee of Defendant Bankcard Services;

c. Filing verifications of the complaint in which the declarant states, under penalty of perjury, that the matters alleged in the complaint are true even though the declarant has no personal knowledge about whether or not the complaint's allegations are true (*e.g.*, whether venue is proper, that the alleged debt amount is accurate, or that the consumer's contract with Defendants provides for the recovery of attorneys' fees);

d. Intentionally failing to properly serve consumers with the summons and complaint in an attempt to increase the rate of default judgments and lower costs of litigation;

e. Filing proofs of service that declare under the penalty of perjury that service was complete (*e.g.*, proofs of service falsely stating that the consumer was personally served when the consumer was not served at all, and proofs of service falsely stating that substitute service was properly effected even though Defendants made no reasonable attempts to personally serve the consumer);

f. Filing proofs of service that bear only a digitally applied facsimile of the declarant's signature, instead of the declarant's original, "wet-ink" signature as required for documents signed under penalty of perjury;

g. Filing declarations in support of the entry of default judgment in which the declarant states, under penalty of perjury, that the declarant is an officer of Chase USA, a custodian of Chase USA's business books and records, and that he or she has personal knowledge of the facts supporting the entry of default when, in fact, the declarant is not an "officer" of Chase USA, but rather a low-level employee of Defendant Bankcard Services (often the same purported officer who signed the complaint verification) and has no personal knowledge of the facts set forth in the declaration including the balance alleged to be owed; and

h. Providing similarly false affidavits in support of those collection actions by third parties who purchase Defendants' credit card accounts.

81. On January 8, 2014, the court denied Chase's motion to dismiss the case filed by the California AG.

82. On July 11, 2013, California Governor Jerry Brown signed legislation backed by the California AG that barred debt buyers from filing lawsuits or engaging in collection efforts

unless they can verify the ownership and amount of a debt. *See* Calif. Debt Collection Restrictions Signed Into Law, Law360 (July 12, 2013), *available at* http://www.law360.com/banking/articles/457029/calif-debt-collection-restrictions-signed-into-law (discussing California Senate Bill 233, the Fair Debt Buying Practices Act).

83.     On December 17, 2013, the Mississippi Attorney General (the "Mississippi AG") filed an action against Chase for its debt collection practices. The Mississippi AG's complaint, which was filed against Defendants JPM, Chase USA, and Bankcard Services, was the product of an 18-month investigation. The complaint alleged, among other things:

    a.    That Chase failed to maintain adequate documentation of the debts allegedly owed by cardholders, and notwithstanding the lack of documentation, Chase attempted to collect on such debts through litigation;

    b.    Chase's collections practices were chaotic and disorganized, leading to collections actions seeking to recover debts that were subject to bankruptcy, settlement, or that had already been paid;

    c.    Chase manufactured affidavits in an effort to obtain cheap default judgments but did not have a process where the affiants would verify the information attested to making the affidavit misrepresent facts to obtain judgment;

    d.    Chase sold accounts to third-party debt buyers that lacked adequate documentation; and

    e.    Chase provided false affidavits to third-party debt buyers in support of debts.

84.     In addition, in conjunction with its increased scrutiny of lenders, including Defendants, the OCC recently issued to its bank examiners a four-page set of "Best Practices" to be used in evaluating banks' sales of delinquent credit cardholder accounts to third parties. *See* OCC Pressures Banks to Clean Up Card Debt Sales, American Banker, *available at* http://www.americanbanker.com/issues/178_127/occ-pressures-banks-to-clean-up-card-debt-sales-1060353-1.html?zkPrintable=1&nopagination=1 (July 2, 2013); *see also* "Debt Sales/Best

Practices," Office of the Comptroller of Currency, attached as Exhibit 8, *available at* http://www.americanbanker.com/pdfs/occ-debtsales-bestpractices.pdf.

85.     The "Best Practices" require that banks selling default credit card accounts to third parties have policies that "[d]etail documentation requirements to ensure accurate and reliable information is provided to the debt buyer at time of purchase."  Debt Sales/Best Practices, Exhibit 8.  The guidelines further require "affirmative sign-off by a quality control review function that the debt sale assets meet the characteristics of the purchase and sale agreement and ***account balances are accurate***."  *Id.* (emphasis added).  Indeed, the quality control function should "ensure account data is complete and accurate and the account data is updated from the system of record."  *Id.*

86.     The OCC's "Best Practices" also provide guidelines as to the proper content for contracts concerning the sale of accounts in default to third party collectors.  These contracts "should confirm the accuracy of account balances … and confirm the completeness and accuracy of account documentation."  *Id.*

87.     Shortly after the OCC released its "Best Practices" guidelines, on July 1, 2013, American Banker reported that JPMorgan Chase "[h]alted most sales to third-party collectors of [credit card] debts [Chase] ha[d] already charged off its own books.  Bank executives ha[d] cited concerns that such sales could cause further damage to its reputation…."  *Chase Halts Card Debt Sales Ahead of Crackdown*, American Banker, *available at* http://www.americanbanker.com/ issues/178_126/chase-halts-card-debt-sales-ahead-of-crackdown-1060326-1.html (July 1, 2013).

**G.**     **Facts Relating to Plaintiff's Experience**

88.     Plaintiff had two revolving credit card accounts with Defendant Chase USA.  The account ending 5909 is herein referred to as "Account I" and the account ending 6196 is herein referred to as "Account II."

89.     At all relevant times, Plaintiff has been employed at Walgreens as a full time hourly employee earning minimum wage.

90.     In late 2008, Plaintiff's husband's business failed, causing Plaintiff and her husband to begin to fall behind in their debt payments on their home and credit card accounts.

91.     Plaintiff became delinquent in payment on each of her Chase credit card accounts.

92.     In September 2009, JPM's legal department filed a collection lawsuit against Plaintiff to collect on Account I.  *See Moya I.*  In the suit, Chase sought $7,320.91 plus interest and costs of suit.  As an exhibit to the complaint, Chase attached a one-page facsimile of a statement for the account with a payment due date of July 26, 2009.  The statement showed a balance of $7,320.91.  However, the "Past Due Amount" was only $1,140.  The balance included a $39 "OVERLIMIT FEE" and interest for the statement period of $159.84.  Chase returned service approximately five months later, on April 14, 2010.

93.     Chase moved for default in *Moya I* on May 28, 2010, which was granted by the court on June 1, 2010.  Chase then moved for final judgment of $8,106.01 comprised of the initial demand of $7,320.91, prejudgment interest of $385.10 ($7,320.91 at 6% per annum for 320 days) and $400 in filing fees and process service fees.  In support of the motion for final judgment, Chase submitted an affidavit of indebtedness and an affidavit of costs.

94.     On information and belief, the affidavit of indebtedness filed in support of the motion for final judgment in *Moya I* was a robosigned affidavit.  A true and correct copy of the

affidavit is attached as Exhibit 9.  It was signed by Kevin Fletcher who purports to be "an officer of CHASE BANKCARD SERVICES, INC., an affiliate of CHASE BANK USA, N.A."  In the affidavit, Fletcher asserts that he is familiar with the "credit procedures, books, and records of CHASE regarding Defendant, Ruth Moya.  Additionally, I am familiar with the identity and method of preparation with regard to the business records of Ruth Moya's account(s), and that the contents of the affidavit herein were predicated upon an examination of such records."  Fletcher further attests to the fact that "CHASE provided monthly account statements to [Moya] reflecting, among other information, transactions to the Account(s) since the preceding billing period, the total amount due on the Account(s), and the minimum payment(s) due."  Fletcher then states that Moya "did not object to the aforementioned account statements at any time [and] [s]ubsequent to issuance of the last monthly account statement to [Moya], CHASE received payments totaling $0.00 on the Account(s)."

95.     On information and belief:  (a) Fletcher never reviewed the books and records that Chase maintained concerning Plaintiff; (b) Fletcher never made any effort to confirm or examine the existence of business records for Plaintiff's account; and (c) Fletcher had no personal basis of knowledge to truthfully assert that Chase provided monthly account statements to Moya or the content of those statements.  Furthermore, on information and belief:  (a) because Fletcher did not review any records prior to signing the affidavit, he could not truthfully assert that Chase did not receive any payments subsequent to issuance of the final statement; and (b) even if Fletcher had reviewed the records, for the reasons discussed herein, it is not at all clear that Chase possessed adequate records to confirm whether Plaintiff had made any payments.  Thus, each of these statements was materially false, and therefore the affidavit was materially false.

96.     Additionally, the affidavit of indebtedness was purportedly sworn to by Fletcher before Notary Public Dorthia Dembo.  As discussed *supra*, however, Chase's practice was not for its notaries to observe the affiant's signature attesting to the facts stated in the affidavits.  Rather, the notaries were in a separate room and never had contact with the affiants.  Thus, although the document was filed with the court purporting to be notarized, on information and belief, the notary seal was also fraudulent.

97.     Despite the material falsity of the statements contained in the affidavit of indebtedness (and the fraudulent notary stamp), the affidavits were filed by the court as a condition precedent to Chase obtaining a final judgment of default.

98.     In reliance on Chase's submissions, including the fraudulent affidavit of indebtedness, the court entered final judgment in the amount of $8,106.01 on August 30, 2010.

99.     On December 11, 2009, JPM's legal department filed a collection lawsuit against Plaintiff to collect on Account II.  *See Moya II*.  In the suit, Chase sought $6,967.96 plus interest and costs of suit.  As an exhibit to the complaint, Chase attached a one-page facsimile of a statement for the account with a payment due date of October 7, 2009.  The statement showed a balance of $6,967.96.  However, the "Past Due Amount" was only $761.  The balance included a $39 "LATE FEE" and interest for the statement period of $174.40.  Chase returned service on January 12, 2010.

100.    Chase moved for default in *Moya II* on February 25, 2010 which was granted by the court on February 26, 2010.  Chase then moved for final judgment of $7,440.52 comprised of the initial demand of $6,967.96, prejudgment interest of $122.56 ($6,967.96 at 6% per annum for 107 days) and $350 in filing fees and process service fees.  In support of the motion for final judgment, Chase submitted an affidavit of indebtedness and an affidavit of costs.

101.    The affidavit of indebtedness filed in support of the motion for final judgment in *Moya II* was a robosigned affidavit.  A true and correct copy of the affidavit is attached as Exhibit 10.  In fact, the affidavit in *Moya II* was identical to the affidavit in *Moya I* except that it was signed by a different Chase employee, notarized by a different notary, and reflected different account information.  It was signed by Zandra Sanchez who purports to be "an officer of CHASE BANKCARD, LLC, an affiliate of CHASE BANK USA, N.A."  In the affidavit, Sanchez asserts that she is familiar with the "credit procedures, books, and records of CHASE regarding Defendant, Ruth Moya.  Additionally, I am familiar with the identity and method of preparation with regard to the business records of Ruth Moya's account(s), and that the contents of the affidavit herein were predicated upon an examination of such records."  Sanchez further attests to the fact that "CHASE provided monthly account statements to [Moya] reflecting, among other information, transactions to the Account(s) since the preceding billing period, the total amount due on the Account(s), and the minimum payment(s) due."  Sanchez then states that Moya "did not object to the aforementioned account statements at any time [and] [s]ubsequent to issuance of the last monthly account statement to [Moya], CHASE received payments totaling $0.00 on the Account(s)."

102.    On information and belief, Sanchez, like Fletcher, never reviewed the books and records that Chase maintained concerning Plaintiff.  Likewise, on information and belief:  (a) Sanchez never made any effort to confirm or examine the existence of business records for Plaintiff's account; and (b) Sanchez had no personal basis of knowledge to truthfully assert that Chase provided monthly account statements to Moya or the content of those statements.  Furthermore, on information and belief:  (a) because Sanchez did not review any records prior to signing the affidavit, she could not truthfully assert that Chase did not receive any payments

subsequent to issuance of the final statement; and (b) even if Sanchez had reviewed the records, for the reasons discussed herein, it is not at all clear that Chase possessed adequate records to confirm whether Plaintiff had made any payments. Thus, on information and belief, each of these statements was materially false and therefore the affidavit was materially false.

103.     Additionally, the affidavit of indebtedness was purportedly sworn to by Sanchez before Notary Public "D. Serrato." As discussed *supra*, however, Chase's practice was not for its notaries to observe the affiant's signature attesting to the facts stated in the affidavits. Rather, the notaries were in a separate room and never had contact with the affiants. Thus, although the document was filed with the court purporting to be notarized, on information and belief, the notary seal was also fraudulent.

104.     Despite the material falsity of the statements contained in the affidavit of indebtedness (and the fraudulent notary stamp), the affidavit was filed with the court as a condition precedent to Chase obtaining a final judgment of default.

105.     In reliance on Chase's submissions, including the fraudulent affidavit of indebtedness, the court entered final judgment in the amount of $7,440.52 on April 19, 2010.

106.     Plaintiff did not have the money or ability to oppose Chase in these collection lawsuits.

107.     After obtaining the default judgments, Chase aggressively pursued collection. Chase filed a writ of garnishment in an effort to garnish Plaintiff's wages. The garnishment action was unsuccessful because Plaintiff, as the head of household following her husband's business's failure, did not earn enough to qualify for wage garnishment under Florida law.

108.    Because Chase monitors Plaintiff's employment status as well as, on information and belief, her status as head of household, Plaintiff remains in danger of future garnishment if and when her husband secures another job.

**H.    Chase's Concealment of Fraud Requires the Tolling of Statutes of Limitation**

109.    The statutes of limitations applicable to Plaintiff's and the Class members' claims should be equitably tolled.

110.    Plaintiff and the Class had no knowledge of, and no way of discovering the conduct at issue in this lawsuit at the time the fraudulent affidavits were filed.

111.    Defendants did not notify, inform or disclose to Plaintiff or the Class that Defendants' affiants were not verifying information contained in their affidavits or that the affidavits were not being signed in the presence of a notary as stated in the affidavits themselves.

112.    Because this conduct was not detectable, despite Defendants' knowledge that the conduct was fraudulent and Defendants' use of the fraud to conceal the true fact that it did not properly verify the accounts and submitted the affidavits under fraudulent pretenses to obtain default judgments, Plaintiff and the Class were not reasonably able to discover the existence of their claims until long after the actual fraud was committed.

113.    Plaintiff acted immediately and diligently upon discovering Defendants' conduct.

114.    Because Defendants concealed their fraudulent conduct, the statutes of limitation applicable to Plaintiff's and Class members' claims should be tolled.

**I.    RICO Allegations**

*The RICO Enterprise*

115.    Defendants, along with non-parties NCO and its subsidiaries, DebtOne, L.L.C., and other unnamed judgment and collection account debt buyers (the "Enterprise") have created

an associated-in-fact enterprise with the goal of collecting on debts allegedly owed by borrowers including Plaintiff and the Class.

116.     The members of the Enterprise have various roles in the collections operation. For example, Chase USA originates the accounts and has relationships with credit card borrowers.  Chase USA also frequently acts as the "plaintiff" in collections litigation.  JPM provides legal support and services for Chase USA when Chase determines that a collection account will be litigated.  CBL and Bankcard Services provide affidavits of indebtedness and notary services to Chase USA when Chase USA litigates collection accounts.  NCO and its subsidiaries provide similar services as JPM for some Chase accounts and also provide other ancillary legal services to Chase.  DebtOne, L.L.C. and other third-party debt buyers (including, on information and belief, NCO) purchase judgment accounts from Chase for the purpose of collecting on those judgments.



117.    Despite the fact that the Enterprise may have a legitimate business purpose of collecting on debts allegedly owed, Chase has coopted the functioning of the Enterprise and operated the Enterprise through a pattern of racketeering activity, as alleged herein.  Chase has engaged in a widespread scheme to defraud Plaintiff, the Class, and the courts to the benefit of Chase and the Enterprise.  Specifically, Chase conspired to perpetrate a fraud on Plaintiff, the Class and the courts to convert Plaintiff's and Class members' defaulted credit card accounts into judgment accounts and either utilize post-judgment remedies against the borrowers or sell the judgment accounts to debt buyers who, themselves, intend to utilize post-judgment remedies. Absent Chase's fraudulent conduct, the default accounts would not have been converted to

judgment accounts and post-judgment remedies could not have been taken against Plaintiff and members of the Class.

### Chase's Illegal Scheme to Coopt the Enterprise

118.     Chase devised an illegal scheme to increase the value of its defaulted credit card debt accounts (the "Scheme").

119.     The object of the Scheme was to convert a high volume of defaulted credit card accounts to judgment accounts without incurring significant costs.  Chase used the Scheme to increase the value of portfolios of the purported debt to increase the sales price of the debtor accounts and, when Chase retained ownership of the portfolio, to increase Chase's recovery rate on the accounts.  Chase employed numerous illegal and unethical tactics to achieve that goal.

120.     Because Chase could not convert its desired volume of collection accounts to judgment accounts by properly performing diligence as to each suit, Chase cut corners, committing fraud in the process, and making a mockery of the court system.

121.     Indeed, as discussed above, to obtain a default judgment, the plaintiff-creditor must make a threshold showing that the alleged debt is owed and that the plaintiff is entitled to relief.  To meet this burden, Chase submitted to the courts affidavits from Chase employees falsely attesting to the existence and accuracy of the amount of the debt. As Chase was unable to produce proper affidavits to meet its desired volume, it developed a highly sophisticated system designed to produce fraudulent affidavits on a mass scale, as detailed herein.

122.     Specifically, Chase set up a four-part affidavit system.  First, the affidavits of indebtedness were auto-generated pursuant to a template that populated the robosigner's name and position, the amount of alleged indebtedness, and the name of the defendant-borrower.  The affidavits were then provided to a processor who reviewed the affidavit.  The processor then

passed affidavits in bulk to the robosigners.  The robosigners then signed each affidavit: (a) without reviewing them for accuracy; (b) without checking the supporting documentation; (c) without discussing the content of the affidavit with the processor; and (d) without taking any step to obtain personal knowledge of the facts underlying the statements contained in the affidavit. The affidavits were then "witnessed" by notaries who had not watched the documents being executed, and therefore, the notary seals on the affidavits are also fraudulent.

123.    Additionally, as described more fully *supra*, Chase failed to maintain adequate records supporting many of the alleged debts in their defaulted credit card portfolios.  Because such documentation and records are required to properly obtain a default judgment, Chase's Scheme sidestepped that issue by having its affiants uniformly avoid reviewing **any** records for **any** borrowers.

### *Racketeering Activities*

124.    In order to perpetuate the affairs of the Enterprise and boost their illegally obtained profits, Chase knowingly and willfully committed the following predicate offenses under 1961(1)(B) of RICO, 18 U.S.C. § 1961(1)(B) constituting "racketeering activity":

   a.   wire fraud in violation of 18 U.S.C. § 1343; and

   b.   mail fraud in violation of 18 U.S.C. § 1341.

125.    By using the United States Postal Service, Federal Express and/or other mail delivery services and electronic systems to transmit fraudulent robosigned affidavits to the courts and between the members of the Enterprise as part of the Scheme, Chase committed mail and wire fraud violations.  These affidavits made materially false assertions as part of a coordinated Scheme to obtain Plaintiff's and members of the Class' money and/or property.  Indeed, without these fraudulent affidavits, Chase could not substantiate the debts alleged and could not obtain

the default judgments required to achieve the goals of the Scheme.  Chase also utilized the mail and wires to send these affidavits to the other members of the Enterprise.  Chase intended the other members of the Enterprise and the state courts to rely upon the affidavits, and the state courts which entered the judgments reasonably did rely upon the affidavits or else the motions for final judgment of default would not have been granted.

### *Pattern of Racketeering*

126.    Chase conspired to commit and did commit numerous violations of these predicate acts.

127.    Plaintiff's counsel has interviewed several confidential witnesses with knowledge of Chase's practices and procedures concerning the execution of affidavits.  According to these confidential witnesses, Chase created and followed written practices and procedures that required employees to execute affidavits attesting to knowledge the employees lacked and required notaries to falsely state that the affidavits were executed in their presence.

128.    Indeed, Chase and their affiliates devised and carried out the Scheme to defraud the courts by submitting fraudulent affidavits in a concerted effort to generate default judgments that increased the value of their defaulted debt portfolios.

129.    For example, Chase submitted fraudulent affidavits to Florida state courts in connection with the *Moya I* and *Moya II* debt collection litigations.  The affidavit in *Moya I* was filed on August 2, 2010.  The affidavit in *Moya II* was filed on April 7, 2010.[6]

130.    These affidavits were transported across state lines (from Texas to Florida) using Federal Express and/or electronic systems constituting mail fraud and/or wire fraud.

---

[6] There is no date indicating when robosigners signed the affidavits in *Moya I* and *Moya II* because, although the notary indicates the affidavit was signed on a given date, it was not Chase's practice to actually sign the affidavits in the presence of the notary.  On information and belief, the affidavits were signed within a few days of the notary signatures.

131.    On information and belief, Chase used the mail and/or wires generated and similarly transported hundreds of thousands of fraudulent affidavits, including thousands of fraudulent affidavits from Texas to Florida.

132.    A cursory look at state court dockets reveals similarly fraudulent affidavits signed by known robosigners.   For example, in California, the California AG found widespread misconduct by Chase in connection with its collections litigation practices, including robosigning of affidavits.

133.    In *Chase Bank USA, N.A. v. Darius A Zubrickas*, No. CGC10500986 (Super. Ct. San Fran. Cty. Cal.), Kevin Fletcher submitted a "Declaration in Support of Entry of Default Judgment" that contained numerous material falsities similar to those attested to in his affidavit filed in connection with *Moya I*.   A true and correct copy of this "*Zubrickas* affidavit" is attached as Exhibit 11.   On information and belief, the *Zubrickas* affidavit was executed on or about July 30, 2010 in San Antonio and contained materially false statements.   In the affidavit, Fletcher stated that he had reviewed the books and records of Chase and that the records reflect that Chase's practice of maintaining records was followed. However, on information and belief, it was Fletcher's practice to not review any records in connection with executing affidavits.   Based on this allegedly fraudulent affidavit, Chase moved for default and obtained a judgment of $27,997.33 against Darius Zubrickas.

134.    In *Chase Bank USA, N.A. v. Gloria C Ramsey*, No. DC 01731809 (Super. Ct. Hudson Cty. N.J.), Kevin Fletcher submitted a "Certification of Proof and Non-Military Service" that contained numerous material falsities similar to those attested to in his affidavits filed in connection with *Moya I* and the *Zubrickas* action.   A true and correct copy of this "*Ramsey* affidavit" is attached as Exhibit 12.   On information and belief, the *Ramsey* affidavit was

executed on or about July 13, 2010 in San Antonio, Texas and contains materially false statements.  In the affidavit, Fletcher asserts that he "verif[ied] the [sic] plaintiff's records are maintained electronically and each annexed statement is a computer generated report setting forth the information as prescribed by [federal statute and regulations] from the periodic statement for the last billing statement prior to this action."  In fact, on information and belief, Fletcher did not verify any such thing in connection with this (or any other) action prior to signing his name.  Fletcher further states "[c]redit has been duly given for all payments and credits due, and there now remains and owing from said defendant(s) to the plaintiff the sum of $4,078.86 together with interest from July 2, 2009 of $114.15 [] making a total of $4,193.01."  However, on information and belief, it was Fletcher's practice to not review any records in connection with executing affidavits that would have provided Fletcher with these numbers.  Using Fletcher's fraudulent affidavit, Chase obtained a judgment of default in the amount of $4,193.01 against Ms. Ramsey on August 6, 2010.

135.     In *Chase Bank USA, N.A. v. Bissoondai Datadeen*, No. DC 02146409 (Super. Ct. Hudson Cty. N.J.), Kevin Fletcher submitted a "Certification of Proof and Non-Military Service" that contained numerous material falsities similar to those attested to in his affidavits filed in connection with *Moya I*, *Zubrickas* and the *Ramsey* action.  A true and correct copy of this "*Datadeen* affidavit" is attached as Exhibit 13.  On information and belief, the *Datadeen* affidavit was executed on or about February 22, 2010 in San Antonio, Texas and contains materially false statements.  In the affidavit, Fletcher asserts that he "verif[ied] the [sic] plaintiff's records are maintained electronically and each annexed statement is a computer generated report setting forth the information as prescribed by [federal statute and regulations] from the periodic statement for the last billing statement prior to this action."  In fact, on

information and belief, Fletcher did not verify any such thing in connection with this (or any other) action prior to signing his name.  Fletcher further states "[c]redit has been duly given for all payments and credits due, and there now remains and owing from said defendant(s) to the plaintiff the sum of $4,470.19 together with interest from August 26, 2009 of $71.96 [] making a total of $4,542.15."  However, on information and belief, it was Fletcher's practice to not review any records in connection with executing affidavits that would have provided Fletcher with these numbers.  Using Fletcher's fraudulent affidavit, Chase obtained a judgment of default in the amount of $4,542.15 plus costs and attorneys' fees of $162.84 against Datadeen on February 24, 2010.

136.    Fletcher made substantially similar material misrepresentations in *Chase Bank USA, N.A. v. Rodel C Egamino*, No. DC02635709 (Super. Ct. Hudson Cty. N.J.), where he submitted a "Certification of Proof and Non-Military Service" that contained the same material falsities similar to those attested to in his affidavits filed in connection with *Moya I*, *Zubrickas Ramsey* and *Datadeen*.  A true and correct copy of this "*Egamino* affidavit" is attached as Exhibit 14.  On information and belief, the *Egamino* affidavit was executed on or about January 20, 2010 in San Antonio and contained materially false statements.  In the affidavit, Fletcher asserts that he "verif[ied] the [sic] plaintiff's records are maintained electronically and each annexed statement is a computer generated report setting forth the information as prescribed by [federal statute and regulations] from the periodic statement for the last billing statement prior to this action."  In fact, on information and belief, Fletcher did not verify any such thing in connection with this (or any other) action prior to signing his name.  Fletcher further states "[c]redit has been duly given for all payments and credits due, and there now remains and owing from said defendant(s) to the plaintiff the sum of $9,533.21 together with interest from October

16, 2009 of $87.24 [] making a total of $9,620.45." However, on information and belief, it was Fletcher's practice to not review any records in connection with executing affidavits that would have provided Fletcher with these numbers. Using Fletcher's fraudulent affidavit, Chase obtained a judgment of default in the amount of $9,620.45 plus costs and attorneys' fees of $264.41 on January 21, 2010.

137.    Each of these affidavits was transported and moved in interstate commerce using the mails and/or wires in violation of the mail fraud statute (18 U.S.C. § 1341) and/or the wire fraud statute (18 U.S.C. § 1343) and constitutes a distinct predicate act.

## CLASS ALLEGATIONS

138.    Plaintiff brings this action on her own behalf and on behalf of all persons similarly situated pursuant to three distinct subdivisions of Federal Rule of Civil Procedure 23. Specifically, Plaintiff seeks certification of a Rule 23(b)(1)(A), 23(b)(2) and/or 23(b)(3) class defined as follows:

> All persons in the United States who have been sued by or on behalf of Chase to collect on a credit card debt and had the court enter a final default judgment based on an affidavit robosigned by a Chase employee (the "Class").

139.    Plaintiff also seeks certification of a Florida subclass under Rules 23(b)(1)(A), 23(b)(2) and/or 23(b)(3) defined as follows:

> All persons who have been sued by or on behalf of Chase in the State of Florida to collect on a credit card debt and had the court enter a final default judgment based on an affidavit robosigned by a Chase employee (the "Florida Class").

140.    The Class and Florida Class are hereinafter referred to collectively as the "Class".

141.    The persons in the Class are so numerous that joinder is impracticable, and the disposition of their claims in this case and as part of a single class action lawsuit, rather than

numerous individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent.

142.    Plaintiff's claims are typical of the claims of the Class she seeks to represent. Plaintiff is a member of the Class she seeks to represent.  Members of the Class are ascertainable from Plaintiff's description of the Class and/or Defendants' records and/or records of third parties accessible through discovery.

143.    Plaintiff will fairly and adequately represent the members of the Class and has no interests that are antagonistic to the claims of the Class.  Plaintiff's interests in this action are antagonistic to the interests of Defendants, and she will vigorously pursue the claims of the Class.

144.    Plaintiff has retained counsel who are competent and experienced in class action litigation, and have successfully represented plaintiffs in complex class actions.

145.    Common questions of law and fact impact the rights of each member of the Class and a common remedy by way of permissible damages, restitutionary disgorgement and/or injunctive relief is sought for the Class.

146.    There are numerous and substantial questions of law and fact common to all members of the Class which predominate over any individual issues.  These common questions of law and fact include, without limitation:

a.    Whether Defendants engaged in a pattern or practice of preparing, submitting and relying on improper, incorrect and fraudulent affidavits (*i.e.*, "robosigned" affidavits) in connection with debt collection actions;

b.      Whether Defendants attempted to collect alleged debts for which they knew that they did not possess adequate or correct documentation to support the amounts that Defendants alleged that cardholders owed;

c.      Whether Defendants and non-parties including, without limitation, NCO, DebtOne and third-party debt buyers form an associated-in-fact Enterprise;

d.      Whether Defendants' transport of robosigned affidavits using U.S. Mail, Federal Express, and/or other interstate mail services in connection with its Scheme to co-opt the operations of the Enterprise constitutes violations of the federal mail fraud statute;

e.      Whether Defendants' submission of robosigned affidavits to courts through electronic filing systems and other electronic communications constitutes violations of the federal wire fraud statute;

f.      Whether Defendants' use of robosigned affidavits to secure default judgments constitutes fraud;

g.      Whether Class members have been damaged by Defendants' conduct;

h.      Whether Class members are entitled to declaratory relief; and

i.      Whether Class members are entitled to injunctive relief.

147.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Trial of Plaintiff's and the Class members' claims is manageable.   Unless a class is certified, Defendants will be unjustly enriched at the expense of Class members.

148.    There is no plain, speedy or adequate remedy other than by maintenance of this class action because Plaintiff is informed and believes that damage to each member of the Class

is relatively small, making it economically unfeasible to pursue remedies other than by way of a class action.

149.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance of a class action.

150.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.   Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants.   Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action, which will result in further damages to Plaintiffs and the Class.

## COUNT ONE
**Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c)**

151.     Plaintiff incorporates paragraphs 1 through 150 as though fully set forth herein.

152.     Defendants are each "person[s]" within the definition of 18 U.S.C. §1961(3).

153.     Chase operated, directed and controlled an ongoing associated-in-fact Enterprise comprised of Chase, non-parties NCO and its subsidiaries, DebtOne, L.L.C., and other unnamed judgment and collection account debt buyers.

154.     The Enterprise had an identifiable structure and functioned as a continuing unit for a period of many years.  The Enterprise shared a common function of attempting to collect on Chase-issued or acquired credit card debts.  Each entity in the Enterprise had its own distinct role:  Chase USA originates the accounts and has relationships with credit card borrowers. Chase USA also frequently acts as the "plaintiff" in collections litigation.  JPM provides legal

support and services for Chase USA when Chase determines that a collection account will be litigated. CBL and Bankcard Services provide affidavits of indebtedness and notary services to Chase USA when Chase USA litigates collection accounts. NCO and its subsidiaries provide similar services as JPM for some Chase accounts and also provide other ancillary legal services to Chase. DebtOne, L.L.C. and other third-party debt buyers (including, on information and belief, NCO) purchase judgment accounts from Chase for the purpose of collecting on those judgments.

155. The Enterprise's core operations were controlled by Chase through Chase's officers and employees responsible for processing collection matters. In operating, directing and controlling the enterprise, Chase committed multiple acts of racketeering activity within the meaning of 18 U.S.C. § 1961, *et seq.* These predicate acts included, but are not limited to mail fraud, 18 U.S.C. § 1341 and wire fraud, 18 U.S.C. § 1343.

156. As a direct and proximate result of Chase's violations of the mail fraud and wire fraud acts, which Chase committed during its operation, direction and control of the Enterprise, Plaintiff and the Class members have been injured in their business and/or property. In particular, and without limitation:

a. Chase's conduct has placed a cloud on Plaintiff's and the Class members' credit-worthiness, restricting or eliminating Plaintiff's and the Class members' ability to obtain personal and/or business credit;

b. Chase's conduct has subjected Plaintiff and the other Class members' property to state law judgment liens, restricting or eliminating Plaintiff's and the Class members' ability to transfer their real and personal property;

c.      Chase's conduct has caused Plaintiff and Class members to be subject to post-judgment remedies including wage garnishment, bank account attachment, and liens on their personal property;

d.      Plaintiff and the Class members will be forced to incur legal expenses for costs and attorneys' fees in order to institute and prosecute state court actions to remove the Enterprise's illegally-acquired judgment liens and reclaim monies illegally obtained.

157.    Plaintiff and the Class are entitled to reimbursement of all amounts taken from them through bank account attachment or wage garnishment.  Plaintiff and the Class are also entitled to a refund of any payments they made as a result of any liens placed on their personal property due to the illegally obtained judgments.

158.    Plaintiff and the Class are entitled to have the default judgments entered against them based on Chase's fraudulent conduct expunged.

159.    Plaintiff and the Class are further entitled to other remedies as deemed appropriate by the Court.

## <u>COUNT TWO</u>
### Violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(d)

160.    Plaintiff repeats and realleges the preceding and subsequent paragraphs of this Complaint.

161.    The Enterprise conspired to defraud Plaintiff, Class members and the courts through an illegal Scheme as described above.  This conspiracy violates 18 U.S.C. § 1962(d).  Specifically, Chase conspired with other members of the Enterprise to obtain default judgments by converting defaulted credit card loan portfolios *en masse* to judgment account portfolios through the use of fraudulent robosigned affidavits.  The debt buyers and debt collectors profited

from Chase's fraud and created a secondary market for the product of Chase's fraud – judgment accounts.

162.     Chase and members of the Enterprise intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.  Chase knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Scheme.  That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

163.     As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the Class have been injured in their business and property in that they have a valid judgment against them premised upon fraudulent submissions; the valid judgment enables the judgment holder to take post-judgment remedies against them including, without limitation, wage garnishment and attachment of their bank accounts; and the statute of limitations for the collection of the alleged amount owed was extended by Defendants fraudulent conduct in violation of RICO.

164.     Defendants are therefore liable to Plaintiff and the Class under RICO.

## COUNT THREE
### Common Law Fraud

165.     Plaintiff repeats and realleges the preceding and subsequent paragraphs of this Complaint.

166.     In order to secure default judgments, Chase had to make a threshold showing in each action that it was entitled to judgment.

167.     Chase used the robosigned affidavits to meet that burden.

168.     Without the robosigned affidavits, Chase's submissions to state courts in support of its motions for default judgments were insufficient to meet Chase's burden.

169.    On information and belief, the material statements in the robosigned affidavits were false.  The affiants did not have personal knowledge of the records of Chase as they pertained to the debtors when the affiants signed the affidavits, and the affiants did not attest to the facts in the presence of a notary.  The affiants could not, without having personal knowledge of the records, properly attest to the existence and amount of the debts at issue.

170.    Necessarily, the state courts relied upon the robosigned affidavits in granting Chase's motions and entering judgments of default.

171.    When Chase submitted the fraudulent affidavits to the courts as part of its motions for default judgment, Chase intended that the courts rely on those affidavits.

172.    Plaintiff and Class members suffered injury due to the state courts' justifiable reliance on Chase's fraudulent affidavits.  In particular, and without limitation:

a.    Chase's conduct has placed a cloud on Plaintiff's and the other Class members' credit-worthiness, restricting or eliminating Plaintiff's and the Class members' ability to obtain personal and/or business credit;

b.    Chase's conduct has subjected Plaintiff and the Class members' property to state law judgment liens, restricting or eliminating Plaintiff's and the Class members' ability to transfer their real and personal property;

c.    Chase's conduct has caused Plaintiff and Class members to be subject to post-judgment remedies including wage garnishment, bank account attachment, and liens on their personal property;

d.    Plaintiff and the Class members will be forced to incur legal expenses for costs and attorneys' fees in order to institute and prosecute state court actions to remove the illegally-acquired judgment liens and reclaim monies illegally obtained therefrom.

173. Plaintiff and the Class are entitled to reimbursement of all amounts taken from them through bank account attachment or wage garnishment. Plaintiff and the Class are also entitled to a refund of any payments they made as a result of any liens placed on their personal property due to the illegally obtained judgments.

174. Plaintiff and the Class are further entitled to punitive damages in connection with Chase's flagrant fraud.

175. Defendants are therefore liable for common law fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, the Class and the Florida Class, prays for judgment entering the following relief:

a) An order certifying a nationwide class for Counts I & II (Federal RICO), and certifying the Florida Class for Count III (common law fraud), pursuant to Fed. R. Civ. P. 23;

b) Injunctive relief requiring Defendants to comply with all applicable state and federal laws and cease their illegal practices;

c) An order requiring Defendants to provide notice to each Class member of the fact that the default judgment against them was obtained on the basis of a robosigned affidavit and/or affidavit that was not properly notarized and informs the Class member of their right and process to reopen the state court collection litigation to vacate the default judgment;

d) An order requiring Defendants to file notice in each state court collection action in which Chase obtained a default judgment they obtained after filing a robosigned affidavit and/or affidavit that was not properly notarized to put the court on notice of Chase's fraud;

e)      An award of actual damages, treble damages, and attorneys' fees and costs pursuant to the federal RICO statute;

f)      Damages attributable to Defendants' violations as alleged herein, punitive damages and statutory damages as allowed by law;

g)      An award of prejudgment and post-judgment interest to Plaintiff and the Class;

h)      An award of attorneys' fees and costs as provided by law;

i)      An order requiring Defendants to notify each of the credit reporting agencies that the default judgments against Plaintiff and the Class were illegally obtained and to provide additional notice once the default judgments are expunged; and

j)      Any other relief as this court may deem proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all claims so triable.

Dated: March 11, 2014               By:     /s/David M. Buckner
                                            David M. Buckner, Fla. Bar No. 60550
                                            Seth E. Miles, Fla. Bar No. 385530
                                            GROSSMAN ROTH, P.A.
                                            2525 Ponce de Leon Blvd., Ste. 1150
                                            Coral Gables, FL 33134
                                            Telephone: (305) 442-8666
                                            Facsimile: (305) 285-1668
                                            Email: sem@grossmanroth.com
                                                   dbu@grossmanroth.com

                                            Shanon J. Carson
                                            Patrick F. Madden
                                            BERGER & MONTAGUE, P.C.
                                            1622 Locust Street
                                            Philadelphia, PA 19103
                                            Telephone:  (215) 875-4656
                                            Facsimile:   (215) 875-4604
                                            Email: scarson@bm.net
                                                   pmadden@bm.net

Joseph P. Guglielmo
Joseph Cohen
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
The Chrysler Building
405 Lexington Ave
40th Floor
New York, NY 10174-4099
Telephone:  (212) 223 6444
Facsimile:  (212) 223 6334
Email: jguglielmo@scott-scott.com
       jcohen@scott-scott.com

Christopher M. Burke
Joe Pettigrew
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
707 Broadway
Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: cburke@scott-scott.com
       jpettigrew@scott-scott.com

Edward W. Millstein
John Weston
SACKS, WESTON, PETRELLI,
DIAMOND & MILLSTEIN LLC
1818 Market Street #1700
Philadelphia, PA  19103
Telephone: (215)-523-6900
Email: tmillstein@swpdlaw.com
       jweston@swpdlaw.com

John Bruster Loyd
JONES, GILLASPIA & LOYD, L.L.P.
4400 Post Oak Parkway
Suite 2360
Houston, Texas 77027
Telephone: (713) 225-9000
Facsimile: (713) 225-6126
Email: bruse@jgl-law.com